Froessel, J. (dissenting).
We do not agree with the conclusions of fact and law drawn by our brethren from the record before us in order to sustain the conviction of this 16-year-old girl. The evidence clearly shows that there was neither a “ continuing assault” nor a “ citizen’s arrest” here. It does show that this arrest was in violation of the legislative mandate and contrary to every decided case in this jurisdiction.
Defendant was concededly arrested by a peace officer without a warrant for a misdemeanor not committed in his presence. It was, therefore, illegal (Code Crim. Pro., § 177), and in consequence she was privileged to use reasonable force in resisting the arrest without penalty of criminal prosecution therefor (People v. Massey, 6 N Y 2d 893; People v. Cherry, 307 N. Y. 308; People v. O’Connor, 257 N. Y. 473; People v. Defore, 242 N. Y. 13; Stearns v. Titus, 193 N. Y, 272; People v. Shanley, 40 Hun 477 [Gen. Term, 3d Dept.]).
Many years ago (L. 1881, ch. 442), the Legislature promulgated in the Code of Criminal Procedure a comprehensive *104 scheme covering all aspects of the law of arrest executed without a warrant (§§ 177, 183, 890; see Report of the Commissioners on Practice and Pleadings [1849], particularly at p. 77). These are not1 ‘ useless and meaningless conditions ’ ’. There is neither room nor right for judicial enlargement or amendment of this legislative scheme (1 Alexander, The Law of Arrest, § 74), and in only one instance under said code is an arrest for a crime of lower grade than felony permitted without a warrant when not committed in the arresting officer’s presence, and this is for vagrancy under section 890, not relevant here.
In view of the comprehensive legislative pre-emption of the field, and further in light of the sacred right of an individual to be protected from an arrest founded upon mere oral complaints where petty crimes of the misdemeanor type are involved, We have strictly construed the code in favor of the one arrested. Thus, even in cases where the complaint made is neither irresponsible nor impulsive and on its face trustworthy, we have declared the arrest illegal if the letter of the statute has not been complied with. Two cases in particular serve to demonstrate the point:
In People v. Defore (242 N. Y. 13, supra, affg. 213 App. Div. 643) the complaining witness was a son of the owner of a rooming house. Defendant Defore rented a room there which was confined to his exclusive use. The son discovered that an overcoat belonging to him was missing. He found the coat hanging in a closet in the defendant’s room. He thereupon detained defendant, who was then in a downstairs hallway— although complainant did not witness the theft—and called the police to the rooming house. When the police arrived, the son was standing in the hallway with defendant and holding the stolen overcoat. The police then arrested defendant for its theft (Record on Appeal in Before, folios 92-105). We held the arrest illegal, despite the trustworthiness of the oral complaint and the detention of defendant by the complainant. The crime was a misdemeanor not committed in the officer’s presence.
In People v. Shanley (40 Hun 477, supra) the General Term, Third Department, relying upon two English common-law cases, held an arrest illegal under these circumstances: A warrant had been issued for the defendant’s arrest. It was in the office of the Chief of Police. An officer went to arrest the *105 defendant as directed in the warrant but did not bring the warrant with him, having left it in the chief’s office. In declaring the arrest illegal—notwithstanding the issuance of the warrant —Learned, P. J., stated the following (p. 479) appropriate to the case before us: “ the innocent citizen has a right to protection. It is hardly safe to say that, without a warrant, a policeman may arrest a citizen for an alleged misdemeanor not committed within his sight. If Knapp [the policeman] was justified in arresting this defendant then the innocent citizen must submit to arrest, without having the right to see the warrant before he yields to the alleged authority. It has not been claimed that there is any special law giving peculiar authority to the policeman of Lansingburgh.”
Time and again this court has supported defendants in criminal cases by establishing court-made rules for their protection, and indeed changing such rules to further that end. In the case before us the Legislature carefully and comprehensively set forth the rules to be followed, and these statutes have been strictly construed in the past, uniformly, as has been demonstrated, in order to preserve “personal liberty ”, which we declared in People ex rel. Livingston v. Wyatt (186 N. Y. 383, 392) to be the “highest care of the law”. Nevertheless, the majority now disregards these positive statutory enactments, stemming from the common law, and strains to import into this case theories upon which to deny the rights of an accused, firmly imbedded in our jurisprudence.
The first theory upon which the Chief Judge proceeds to sustain defendant’s conviction is that the “visible signs of a continuing assault” were “right in front of the policeman’s eyes”. The reference is to the alleged “copious” bleeding of Mrs. Salzberg, the crowd that had gathered, and the ‘ ‘ kicking [by the accused] at the door ” allegedly to get “ another crack at her victim”. Such descriptions cannot supplant the evidence. Whatever may have been visible to the police here did not render the assault a continuous one, and thus one committed in the officer’s presence.
The principal testimony upon which defendant was convicted below came from Mrs. Salzberg. She testified that her daughter was struck, presumably for no reason, by one of the three passing Negro girls. She then rushed to the aid of her daughter *106 and pulled her into the store. The gaps in her testimony up to this point were filled by the testimony of the three girls. They testified that Mrs. Salzberg’s daughter had addressed one of them as a “ black nigger ” while they were passing by. This provoked the slap on the daughter’s face, followed, according to them, by Mrs. Salzberg’s rushing out of the store and hitting one of the girls over the head with an iron stool, drawing blood. But, this aside, returning to Mrs. Salzberg’s testimony, after she pulled her daughter into the store, defendant allegedly followed her into the store and struck her with her fist. As a result, Mrs. Salzberg sustained a nosebleed—a far cry indeed from any grievous harm.
After this episode, defendant and the two other girls with her left the store. They went away. That is the testimony of Mrs. Salzberg. Indeed, they went 5 or 6 blocks away to call the mother of the girl whom Mrs. Salzberg allegedly hit on the head with the iron stool. Later, a woman “ stuck her head in the doorway ” and said “ ‘ A mob is coming down the street ’ ”. Mrs. Salzberg thereupon locked the door and called the police. Between 12 and 15 patrol cars and 60 or 70 policemen arrived shortly thereafter. Among them were Patrolman Landau and Sergeant Miller, who was in charge.
Landau and Miller testified that when they arrived at the scene defendant was standing near the front of the store, kicking on the door and screaming profanities at someone inside. Sergeant Miller entered the store, and, after speaking with Mrs. Salzberg, the arrest of defendant “on the complaint of Mrs. Salzberg ” was executed.
We fail to see how a “ continuing assault ” is made out upon this evidence. To the contrary, it is clear that the alleged assault upon Mrs. Salzberg had been completed well before the police arrived at the scene; and the barrier of a locked door precluded any resumption or continuation of the assault. The blood on Mrs. Salzberg’s face from her nosebleed, the presence of the crowd, or defendant’s kicldng and screaming in front of a locked door cannot conceivably be deemed a continuance of the alleged assault itself. We are left, then, upon objective examination of the evidence, with an arrest executed without a warrant for a misdemeanor not committed in the officer’s *107 presence, and, therefore, illegal. This is not “ strange law”. It is rather the firmly established law of this State.
The additional theory is advanced by the majority that there was a citizen’s arrest here (Code Grim. Pro., § 183). This, too, is not borne out by the facts before us. Section 171 of the Code of Criminal Procedure defines how an arrest is made, namely, “by an actual restraint of the person of the defendant ”. There was no restraint here by Mrs. Salzberg. That was physically impossible since a locked door separated her from the defendant, who was on the outside. The mere oral request by her to the officer—in reply to his question — to take the defendant into custody in nowise approaches the physical restraint expressly required by the code. Her statement amounted to nothing more than an unsworn complaint against defendant *, and it is precisely to avoid arrests upon such unsworn allegations by citizens that a warrant is required by our statutes and case law.
The cases cited by the Chief Judge actually support our views. In People v. Ostrosky (95 Misc. 104 [Nassau County Ct.]) there was an actual physical arrest and detention of the defendant by the complainant for a crime committed in his chicken yard and in his presence. That arrest was, therefore, made in accordance with section 171 (supra). And in People ex rel. Gunn v. Webster (75 Hun 278) the crime was committed in the presence of the officer in charge. The officer with him, who made the arrest, did so at his direction. Judge Haight in that case aptly said (p. 282) that the officer in charge “had the right to call to his aid the other officers, and whatever they did under his direction may be treated as his act ”. Of course that is so, but it is not this case, where no officer witnessed the alleged assault.
Plainly, the facts and circumstances of this case did not in law justify the police action taken. On the contrary, had the police obeyed the law, they would have told Mrs. Salzberg that they had no right to arrest the defendant, but that her remedy *108 was to make a formal complaint and procure the issuance of a summons or warrant of arrest, according to law. If this proper course had been followed, the assembled crowd could then have been readily dispersed, and peace restored without harm to anyone. It was because of their violation of the law and their mishandling of this defendant, who stood upon her rights, that the ensuing trouble occurred.
By affirming here, we are breaking down the protection long afforded our citizens from arrests for petty crimes on hearsay, and opening the door to countless arrests of persons in misdemeanor cases on a merely oral complaint, contrary not only to the express mandate of our statutes, but to all our decisional law.
The order appealed from should be reversed, and the information dismissed.
Judges Dye and Burke concur with Chief Judge Desmond; Judge Fuld concurs in a separate opinion; Judge Froessel dissents in an opinion in which Judges Van Voorhis and Foster concur.
Judgment affirmed.

 She never did swear to a complaint in court — subjecting her to possible perjury and to charges for malicious prosecution— (allegedly because of fear), and a disorderly conduct charge made by the police against defendant was not sustained.